UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10161-RGS

KAREN MARKOSYAN

v.

CITIZENS FINANCIAL GROUP, INC.
d/b/a
CITIZENS BANK

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

October 28, 2011

STEARNS, D.J.

In this employment discrimination and retaliation case, plaintiff Karen Markosyan alleges that defendant Citizens Financial Group, Inc. (Citizens), terminated his at-will employment in violation of Massachusetts public policy. Presently before the court is Citizens' motion for summary judgment. The court heard oral argument on the motion on October 25, 2011.

BACKGROUND

The facts, in the light most favorable to Markosyan as the nonmoving party, are as follows.[1]  On or about October 22, 2007, Markosyan, a resident of Framingham,

---

[1] On summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the

Massachusetts, was hired by Citizens, a Delaware corporation with a principal place of business in Rhode Island.  *See* Notice of Removal (Dkt #1) ¶ 3.  He was initially assigned to work at the Citizens Bank branch in Wellesley, Massachusetts.  Prior to reporting to his job, Markosyan signed an "Acknowledgment of Responsibility to Read and Comply with all Citizens Financial Group's Policies," including the Code of Business Conduct and Ethics (Code of Ethics).  Paterniti Decl.- Ex. E.[2]  Section 6.1 of the Code of Ethics, entitled "Personal Conduct – General Information," states in pertinent part:

> Employees are the Company's most valuable assets, and the proper conduct of employees is essential to the success of the Company.  It is imperative that all employees conduct their daily activities, transactions and interactions with customer [sic], fellow colleagues, our regulators and others with the highest standard of integrity and professionalism. Employees should act in a courteous and considerate manner at all times, and should be respectful of the rights of others.  It is expected that employee conduct be consistent with the more specific guidelines set forth in other CFG Policies, including but not limited to the CFG Information Security Policy and Standards, the DFG Use of the Internet Policy and the CFG Consumer Privacy Policy.  The Company, at its discretion, is the sole determiner of what types of conduct are improper or inappropriate and what action, if any, will be taken.

---

nonmoving party's favor."  *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993).

[2] At his deposition, Markosyan acknowledged that the signature on the form was his.  Markosyan Dep. Tr. at 198-199.

Paterniti Decl. - Ex. F (Code of Ethics) § 6.1.[3]

On July 14, 2008, Markosyan filed a Non-Payment of Wage and Workplace Complaint Form with the Massachusetts Attorney General, claiming that he (and other employees) had not been paid overtime during April of 2008.  Citizens subsequently paid Markosyan for the overtime hours at issue, and Markosyan signed a statement acknowledging that he was "fully compensated for all hours worked at Citizens and that no additional wages are due." *Id*. - Ex. G.[4]  Markosyan claims that after he filed the wage complaint, the Wellesley Branch Manager retaliated against him "by sending him to the teller line making it harder to meet his goals."  Pl.'s SOF ¶ 4.

---

[3] Section 6.1, as quoted above, appears in a copy of the Code of Ethics filed by defense counsel.  This copy of the Code states that its effective date is January 31, 2008, approximately four months after Markosyan signed the form acknowledging that he would read and comply with the Code within his first thirty days of employment. *Id*. - Ex. E.  It is unclear whether Section 6.1, as quoted above, appeared in the version of the Code that was in effect within the first thirty days of Markosyan's employment.  However, Markosyan does not raise this issue, and in any event, his signed acknowledgment form states that "[s]ince information, policies and benefits described in the Policies and Procedures are subject to change, I understand and agree that such changes can be made by the CFG [Citizens Financial Group] in its sole and absolute discretion, and I agree to observe those changes in all respects." *Id*.

[4] At his deposition, Markosyan claimed that he signed this acknowledgment form because Adriana Seaton, Human Resources Consultant for Citizens, threatened that if he did not sign it, he would not be able to continue working for Citizens.  Markosyan Dep. Tr. at 88.  Markosyan now also asserts that he received only "some" of the overtime compensation he was due.  Pl.'s SOF ¶ 4.

Markosyan subsequently sought a transfer from the Wellesley branch.  In September of 2008, he was promoted to a Banker II position and transferred to a Citizens Bank branch in Watertown, Massachusetts.  When Markosyan began working in Watertown, his Branch Manager supervisor was Nastassia Prakharenka.  On or about March 25, 2009, Prakharenka met with Markosyan to discuss his annual performance review.  Markosyan "was displeased with his overall performance rating as he had not been criticized before relative to the issues raised in the evaluation, and he believed the evaluation was in bad faith, motivated by [Prakharenka's] desire to retaliate against him because he had questioned her practices."  Pl.'s SOF ¶ 10.[5]

On or about the same day as his performance review, Markosyan sent an email to Regional Manager Dolly Moser, copying Citizens' Chief Executive Officer,

---

[5] Citizens alleges that during the performance review meeting, Markosyan "reacted negatively by throwing the review at [Prakharenka] and threatened that she must change his rating.  Ms. Prakharenka stated that she felt that he was physically dangerous to the branch and excused him for the rest of the day."  Def.'s SOF ¶ 10. Markosyan, for his part, asserts that he "did not throw the review, he only put it back on the table and said it was fake and [Prakharenka] had made up the accusations.  He did nothing to threaten [Prakharenka] or do anything to communicate that he was physically dangerous."  Pl.'s SOF ¶ 10.  Markosyan claims that Prakharenka excused him for the rest of the day because he was preparing an email complaint about her to send to the Human Resources department.  Markosyan Dep. Tr. at 97, 107.

cataloging allegations of wrongdoing on Prakharenka's part.[6]  In his email, Markosyan listed fourteen questionable activities undertaken by Prakharenka.[7]  Upon learning of Markosyan's allegations, Moser notified her supervisor, Grace Pereira.   Pereira directed Moser to notify the Human Resources department, which Moser did.  Moser also forwarded to the Human Resources department a complaint from Prakharenka, stating that Markosyan had acted unprofessionally and in a threatening manner during his performance review meeting.

Moser also contacted Markosyan.  She asked Markosyan why he had not contacted her first to discuss the complaints against Prakharenka.  According to Markosyan, he replied that he had contacted company executives directly "because he had a previous issue about his health insurance information not being kept up to date," and in that instance, "HR did not resolve that problem but minutes after plaintiff sent an email to the CEO, the issue was resolved."  Pl.'s SOF ¶ 17.[8]

---

[6] At his deposition, Markosyan stated that he could not recall whether he reported his complaints about Prakharenka before or after the performance review. Markosyan Dep. Tr. at 112-113.

[7] Five of these activities (wire policy violations, customer signature falsifications, opening fake accounts, false settling, and transferring funds in customer accounts) constituted potential criminal violations.  Def.'s SOF ¶ 13.

[8] According to Moser, Markosyan stated that she (and management generally) was "useless"; he accused her of trying to cover up his complaints; and he warned her to be "careful" about what she said to him, as he would publicize it.  Moser

After receiving Markosyan's allegations against Prakharenka, Citizens initiated an investigation, which was conducted by Julie Aloise of Citizens' Corporate Security department. She interviewed Markosyan, his co-workers at the Watertown Branch, and Prakharenka. She also reviewed videotape and documents. Prakharenka admitted to violating Citizens' policy by forging a customer's signature and allowing a customer's husband to sign his wife's name. Based on this misconduct, Prakharenka was fired by Citizens on or about April 9, 2009.

Subsequently, Adriana Seaton, Human Resources Consultant for Citizens, investigated Prakharenka's complaints against Markosyan. Seaton interviewed Markosyan's co-workers at the Watertown branch and reviewed Aloise's investigative report.[9] Seaton also learned of the inappropriate comments that Markosyan had allegedly made to Moser. Based on her investigation, Seaton prepared a written warning to be delivered to Markosyan.[10] On or about May 12, 2009, Moser and

---

communicated this incident to the Human Resources department. Def.'s SOF ¶ 17. Markosyan denies making any of these statements. Pl.'s SOF ¶ 17.

[9] Citizens asserts that Seaton also interviewed Markosyan himelf, but Markosyan denies that Seaton interviewed him "in connection with any investigation relative to his misconduct." Pl.'s SOF ¶ 22.

[10] Markosyan admits that he received a written warning, but claims that the incidents of misconduct cited in the warning (that he made insubordinate and inappropriate comments to Moser and to the new Branch Manager) were false. Pl.'s SOF ¶ 23.

Pereira met with Markosyan to deliver the written warning.  Seaton attended the meeting by telephone.  Moser read the written warning to Markosyan, who "was upset with the warning because he thought it was false and retaliatory."  Pl.'s SOF ¶ 24.[11]

On May 13, 2009, Markosyan sent an email to Moser, the Human Resources department, and all Citizens employees in the entire Boston Metro region.  In the email, Markosyan accused Moser of violating various laws and retaliating against him by giving him undeserved warnings.  Seaton Decl.- Ex. A; Pl.'s SOF ¶ 25.[12]  After receiving Markosyan's email, Moser forwarded it to Pereira, expressing concern that Markosyan had sent the email to all Citizens employees in the region.  Pereira, in turn, communicated with the Human Resources department regarding Markosyan's conduct.  Seaton and her supervisor, Bruce Nichols, decided that Nichols and Pereira would hold a meeting with Markosyan on May 14, 2009.  The purpose of the meeting was to allow Markosyan to air his concerns, and to inform him that his broadcast email was a

---

[11] Citizens claims that Markosyan reacted by uttering profanities in the meeting. Def.'s SOF ¶ 24.  Markosyan denies uttering any profanities, and claims that he "was respectful."  Pl.'s SOF ¶ 24.

[12] Citizens characterizes Markosyan's email as "a rambling diatribe of various accusations against Ms. Moser of a confidential nature."  Def.'s SOF ¶ 25.  Markosyan denies that the information contained in his email was confidential.  He claims that Seaton had told him that "he could share any information with other bank employees as long as the information did not contain confidential information such as customer specific information."  Pl.'s SOF ¶ 25.

violation of Citizens' Code of Ethics and would not be tolerated.

Markosyan arrived at the meeting with a video recorder. According to Markosyan, Nichols and Pereira refused to proceed with the meeting.[13]  Shortly after the aborted meeting, Seaton sent Markosyan an email stating in pertinent part:

> In the future all correspondence should be addressed through appropriate management channels or through the ER Service Center . . . . Emails sent to the entire Retail Region detailing confidential matters are not acceptable and violate the Code of Ethics. The privacy of our colleagues is of the utmost importance.

Seaton Decl. - Ex. B. Seventeen minutes later, Markosyan replied to Seaton's email, once again copying all Citizens employees in the Boston Metro region. *Id*. - Ex. C. Markosyan claims that he sent this second email to the entire region

> because Ms. Seaton had just recently told him that he could share any such information with other bank employees as long as such transmission did not contain any confidential customer information. Plaintiff thought that there was a vendetta against him for reporting his accusations against [Prakharenka], and such vendetta was manifested by false accusations against him. He perceived that Ms. Seaton, Ms. Pereira and Ms. Moser was [sic] conspiring against him. He thought that if he distributed these accusations to a wide circle, he would be protected against the making of false charges against him. He did not believe that his sending the emails to a wide circle was a violation of the code of ethics.

---

[13] Citizens claims that Markosyan refused to go forward with the meeting without being allowed to videotape it. Def.'s SOF ¶ 28. Markosyan denies that he refused to proceed with the meeting. Pl.'s SOF ¶ 28.

Pl.'s SOF ¶ 30.[14]

Seaton and Nichols discussed Markosyan's insubordination and second violation of the Code of Ethics. They decided to suspend Markosyan with pay immediately, and to submit a formal request to terminate his employment.[15] Between May 14, 2009, and May 18, 2009, Seaton and Nichols, after consulting with in-house legal counsel and a representative from the Business Unit, decided to terminate Markosyan's employment. On or about May 22, 2009, a Citizens employee contacted Markosyan and instructed him to report to the Medford Operations Center in fifteen minutes for a termination meeting. Markosyan responded that he was in Rhode Island and could not be in Medford in fifteen minutes. In lieu of a termination meeting, Seaton sent Markosyan a letter notifying him that he had been terminated. The letter did not provide the reasons for his termination, but simply stated that since he had failed to attend the termination meeting, the letter would serve as notice that he was being terminated.

---

[14] Markosyan's claim that "[h]e did not believe that his sending the emails to a wide circle was a violation of the code of ethics" is incredible with respect to his second email, which was sent as a direct response to Seaton's message explicitly stating that the sending of such emails constituted a violation of the Code of Ethics. *See* Seaton Decl. - Ex. C.

[15] Markosyan claims that Seaton told him that he was suspended for a violation of the Code of Ethics, but when he asked her what the violation was, she did not respond. He claims that Seaton "would not give him any specifics and did not tell him that it was because he sent the second email to a wide distribution list." Pl.'s SOF ¶ 31.

Seaton Decl. - Ex. F.

On December 31, 2009, Markosyan filed a Complaint in Suffolk Superior Court, alleging that Citizens had discharged him in retaliation for his complaints "that one or more of Citizens Bank's managers were defrauding the bank and/or committing other unlawful actions." Compl. ¶ 1. On February 2, 2010, the case was removed by Citizens to this court. Citizens now moves for summary judgment.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). "Even in retaliation cases, 'where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007), quoting *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).

The parties do not dispute that Markosyan was an at-will employee. Generally,

"[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Jackson v. Action for Boston Cmty. Dev. Inc.*, 403 Mass. 8, 9 (1988). The exceptions are where an employee is terminated contrary to a "well-defined" public policy, or terminated in bad faith as a means of depriving the employee of earned wages, bonuses, or commissions. *See Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472 (1992); *id.* (Liacos, C.J., dissenting) at 477 n.1. Markosyan invokes the public policy exception, claiming that he "had a legal right and privilege to bring to his employer's attention the matters which he reasonably believed to be illegal." Compl. ¶ 7.

Whether a retaliatory firing violates public policy is a matter of law for the court to decide. *Wright*, 412 Mass. at 472; *see also Mello v. Stop & Shop Cos.*, 402 Mass. 555, 561 n.7 (1988) ("It is not for the jury to define the public policy. The judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated."). More precisely stated, "[t]he question is whether a well-established public policy is served by denying the employer the right freely to discharge an employee for engaging in particular conduct." *Shea v. Emmanuel Coll.*, 425 Mass. 761, 762 (1997).

The public policy exception is interpreted "narrowly," *Perkins v. Commonwealth*, 52 Mass. App. Ct. 175, 179 (2001), and "internal corporate matters

do not provide a basis for the public policy exception." *Dorman v. Norton Co.*, 64 Mass. App. Ct. 1, 10-11 (2005). *See also Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 151 (1989) ("In *Mello . . .* , we specifically said that internal matters, including internal policies, could not be the basis of a public policy exception to the at-will rule.").

However, to this exception there is a further exception: an at-will employee will have a cause of action if she is discharged for reporting criminal conduct, even when the complaint is made internally to corporate officials, rather than to public authorities. *Shea*, 425 Mass. at 762-763. In such cases, the employee has

> an obligation to present facts on the record that support[] her claim that she was discharged for reporting criminal conduct to her superiors. An assertion or speculation that the [employer] discharged her for that reason is not sufficient to create a dispute of material fact concerning the reason for her discharge.

*Id*. at 763-764.

Here, Markosyan has failed to present any evidence that his termination was causally related to his complaints about Prakharenka's arguably criminal conduct. Markosyan simply speculates that "there was a vendetta against him for reporting his accusations" against Prakharenka. Pl.'s SOF ¶ 30.[16] He has failed to demonstrate that

---

[16] Citizens contends that "[o]ver the course of his employment at Citizens, Plaintiff showed a pattern of suspecting Citizens managers of targeting him." Def.'s SOF ¶ 4.

Seaton or Nichols (or any other Citizens employee) evinced a motive to retaliate against him for the report.  Rather, the undisputed evidence is that Citizens promptly investigated Markosyan's allegations and, as a result, terminated Prakharenka in early April of 2009.[17]  There is simply no evidence that establishes a causal link between Markosyan's complaints about Prakharenka's misconduct, which led to her termination, and his acts of insubordination approximately two months later, which led to his own.

In this latter regard, the undisputed evidence shows that Citizens had a legitimate reason to discharge Markosyan:  he had violated Citizens' Code of Ethics and committed insubordination by sending two inappropriate emails to all employees in the Boston Metro region.[18]  It is worth noting that while there is a public policy against employer retaliation for an employee's performance of a public deed, there is an equally firm adjunct of this policy, that an employee may not insulate himself from the

---

[17] As Citizens notes, Markosyan's retaliation claim is further undermined by the fact that Moser (the Regional Manager whom Markosyan alleges harbored a retaliatory animus against him) was not involved in the decision to terminate his employment.  *See* Def.'s SOF ¶ 18, 24, 31; *Mole v. Univ. of Mass.*, 442 Mass. 582, 602 (2004) (affirming directed verdict where adverse decision was made independently from the alleged retaliators, and plaintiff demonstrated no causal link between retaliatory animus and adverse action).

[18] While Citizens in my estimation had a legitimate reason to fire Markosyan, because his employment was at-will, it needed no reason at all.

consequences of his own intervening misconduct by proffering accusations against others.

ORDER

For the foregoing reasons, Citizens' Motion for Summary Judgment is ALLOWED.  The Clerk will enter a dismissal with prejudice and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____

UNITED STATES DISTRICT JUDGE